In re **CONTINENTAL AIRLINES, INC., et al., Debtors.**

Gus **KAPERNEKAS, Appellant,**

v.

**CONTINENTAL AIRLINES, INC., et al., Appellees.**

Bankruptcy No. 90–932.
Civ. A. No. 92–426–JLL.

United States District Court,
D. Delaware.

Nov. 9, 1992.

Stephen W. Spence and Doreen H. Becker of Phillips, Goldman & Spence, P.A., Wilmington, DE, for appellant.

William H. Sudell, Jr. and Luke W. Mette of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, and Daniel P. Casey of Continental Airlines, Inc., Houston, TX, of counsel, for appellees.

William C. Carpenter, Jr., U.S. Atty., Ellen W. Slights, Asst. U.S. Atty., Wilmington, DE, and Jerry M. Hunter, Gen. Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karatinos, Acting Associate Gen. Counsel, Eric G. Moskowitz, Deputy Asst. Gen. Counsel for Special Litigation, and Steven F. Rappaport, Atty., of the N.L.R.B., Washington, DC, for Amicus Curiae.

## OPINION

LATCHUM, Senior District Judge.

## I. INTRODUCTION

This case is before this Court pursuant to a Notice of Appeal filed by appellant, Gus Kapernekas. Appellant seeks the reversal of the June 8, 1992 Order of the Bankruptcy Court (Balick, J.) denying his Motion for Allowance and Payment of an Administrative Claim pursuant to 11 U.S.C. § 503(b)(1)(A) for that portion of his claim representing post-petition lost wages and other benefits.[1] Due to the fact that the back pay claim at issue in Kapernekas' motion is quite similar to the backpay orders issued by the National Labor Relations Board (the "NLRB"), in its capacity as the agency charged by Congress with the enforcement of the National Labor Relations Act (the "NLRA"), 29 U.S.C. § 151 *et seq.*, the National Labor Relations Board submitted a Petition for Leave to File Amicus Brief and to Present Oral Argument to this Court. That petition was granted on October 5, 1992.

This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 158(a). For the reasons set forth below, this Court affirms the June 8, 1992 Order of the Bankruptcy Court.

1. The parties have not agreed on the total amount of the claim. They instead have litigated the legal issue of the allowability of the claim as a threshold matter. Since the bankruptcy court denied appellant's claim based on a finding that his claim for post-petition back wages did not constitute an administrative priority within the meaning of 11 U.S.C. § 503(b)(1)(a), this Court's review is limited to that issue alone.

## II. FACTS

Appellant, Gus Kapernekas, ("Kapernekas") was hired by appellee, Continental Airlines, Inc. ("Continental"), as an air frame and power mechanic in April, 1963. In 1972 and 1975, Kapernekas underwent surgery (laminectomies) for back problems. Kapernekas continued to work for Continental after his surgeries. (Docket Item ("D.I.") 8 at A–106.)

In August 1983, Kapernekas and other Continental employees went on strike. (D.I. 6 at 4.) During the strike, Kapernekas worked as an airline mechanic for Capitol Airlines for approximately 6 months and then for McClain Airlines for approximately 100 days. His job duties with both airlines were essentially the same as his duties with Continental. (D.I. 8 at A–106.) In May, 1985, at the conclusion of the strike, Kapernekas was contacted by Continental and told he could return to work only if he passed a physical examination. After undergoing the physical exam, Kapernekas was told by Continental that he could not return to work because his previous back problems indicated an inability to meet the lifting requirements for his job. (D.I. 6 at 4.)

On June 25, 1985, Kapernekas filed a charge with the Illinois Department of Human Relations alleging handicap discrimination. On October 17, 1989, an administrative law judge found in favor of Kapernekas stating, "[i]n bald terms, complainant [Kapernekas] was disqualified from employment based upon an 11 year old surgery that had never previously affected his ability to perform the duties of his job." (D.I. 8 at A–122.) On or about March 15, 1990, the administrative law judge issued a "Recommended Order and Decision" recommending that Continental be ordered to reinstate Kapernekas, award him back pay of $141,709.10, reimburse his

medical expenses, and award him attorney fees and costs. On October 10, 1990, the Illinois Human Rights Commission affirmed the administrative law judge's recommended order and adopted it with minor changes.[2] On November 9, 1990, Continental filed a Petition for Rehearing with the Illinois Human Rights Commission; that petition was denied on February 1, 1991. In the interim, on December 3, 1990, Continental filed a petition for relief under Chapter 11 of the Bankruptcy Code. On January 28, 1992, the Circuit Court of Cook County Illinois enforced the October 10, 1990 Order and Decision of the Human Rights Commission. Continental reinstated Kapernekas shortly thereafter. (D.I. 6 at 4.)

On or about April 16, 1992, Kapernekas filed in the Bankruptcy Court a Motion for Allowance and Payment of an Administrative Claim (the "Motion") pursuant to 11 U.S.C. § 503(b)(1)(A). In that Motion, Kapernekas sought to have that portion of his claim which represented back pay and other benefits accruing after Continental filed its petition for relief under Chapter 11 on December 3, 1990, in short, his post-petition back pay, accorded administrative priority status, pursuant to 11 U.S.C. 507(a)(1) and 11 U.S.C. 503(b)(1)(A).[3] Continental opposed the Motion and a Hearing, was held on June 4, 1992. At the conclusion of the hearing, Judge Balick denied the Motion and on June 8, 1992, entered an order to that effect. Kapernekas now appeals that order.

## III. STANDARD OF REVIEW

The only issue presented on appeal is one of statutory interpretation and thus a question of law. The Bankruptcy Court's decisions of law are subject to plenary review. *Meridian Bank v. Alten*, 958 F.2d

2. One relevant change in the October 10, 1990 Order and Decision of the Human Rights Commission (the "Order and Decision") was the clarification of the back pay award. The Order and Decision specified that the award for back pay was an award from the time of Continental's refusal to reinstate Kapernekas to the date of reinstatement as opposed to a lump-sum award of $141,709.10. (D.I. 8 at A–108.)

3. Kapernekas and Continental appear to be in agreement that as to the back pay which accrued pre-petition, Kapernekas is entitled to a general unsecured claim. (Transcript ["Tr."] at 37.)

1226, 1229 (3rd Cir.1992); *Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 84 (3rd Cir.1988).

## IV. DISCUSSION

11 U.S.C. § 507(a)(1) states in relevant part:

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under section 503(b) of this title. . . .

11 U.S.C. § 503(b)(1)(A) states:

(b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

The sole question before this Court is whether Kapernekas' claim for back wages constructively earned from the date Continental filed its petition for protection under Chapter 11 until his reinstatement ("post-petition back pay") constitutes an administrative expense within the meaning of section 503(b)(1)(A).

The Bankruptcy Court denied Kapernekas' Motion [4] stating:

Gus Kapernekas in Continental's pre-petition days was dismissed from his employment. As a result of that dismissal, he took action in the Illinois system seeking reinstatement and [a] back pay award. As a result of the natural appellate process in the Illinois action, he was ultimately successful in obtaining a back pay award and reinstatement as a mechanic for Continental. He is seeking by his motion today an award of administrative priority for that portion of the back pay award subsequent to Continental's filing its Chapter 11 on December 3, 1990 through to and including the date of his reinstatement in the position at Continental.

I agree with Judge Bentz and his reasoned decision in the Wheeling case [5] that the key to this matter is the plain language of the statute, Section 503(b)(1)(a) of Title 11 of the United States Code, which states that after notice and a hearing there shall be allowed administrative expenses, including the actual necessary costs and expenses of preserving the estate, including wages for services rendered after the commencement of the case.

There is no opposition from Continental to the effect that Mr. Kapernekas is not entitled to that amount which has been determined he is entitled to as a general unsecured claim at this juncture. But to the extent that there is a request that it be given administrative priority status, Mr. Kapernekas does not meet the standards for such treatment. Rather than to give all of the stated reasons that Judge Bentz did in his opinion which was carefully reasoned, I merely adopt his findings.

(Transcript ("Tr.") at 36–38.)

The Bankruptcy Court's opinion thus must be read as having incorporated the reasoning of Judge Bentz in *In re Wheeling–Pittsburgh Steel Corporation,* 113 B.R. 187 (Bankr.W.D.Pa.1990) vacated as moot and without precedential value, 147 B.R. 874 (W.D.Pa.1992). The *Wheeling* case had presented an almost identical

---

**4.** The Bankruptcy Court's June 8, 1992 Order denying Kapernekas' Motion incorporates the reasons offered when the Motion was denied at the hearing. "Now, therefore, for the reasons stated in open court at the Hearing, IT IS HEREBY ORDERED that the Motion is denied and no portion of the claim by Kapernekas is allowed as an administrative claim pursuant to 11 U.S.C. § 503(b)(1)(A)." (D.I. 8 at A–1.)

**5.** *In re Wheeling–Pittsburgh Steel Corporation,* 113 B.R. 187 (Bankr.W.D.Pa.1990,) vacated as moot and without precedential value, 147 B.R. 874 (W.D.Pa.1992). The *Wheeling* case had been vacated at the time of Kapernekas' Motion. It was vacated in accordance with a settlement agreement reached by the parties while an appeal was pending. (D.I. 10 at 18.) Continental argued and the Bankruptcy Court accepted the reasoning set forth in the *Wheeling* case.

question to the one at hand.[6] The *Wheeling* court characterized the issue as:

What is the allowability and priority in bankruptcy of a claim arising under an NLRB order of back pay and reinstatement.

*In re Wheeling–Pittsburgh Steel Corp.*, 113 B.R. 187, 189. In that case, as here, the NLRB urged that "back-pay awards be treated as wages and that claims for back-pay awards should be entitled to priority status." The *Wheeling* court clarified the issue by stating:

This case involves a conflict between the policies of the NLRA [National Labor Relations Act] to make workers whole for losses suffered on account of an unfair labor practice and of the Bankruptcy Code to permit successful rehabilitation of debtors by balancing the interests of the affected parties—the debtor, creditors, and employees.... 

Once the NLRB has completed its determination of the amount of monetary compensation owed by the Debtor as a result of an unfair labor practice, the priority and allowability of claims resulting from an NLRB award is answered from the Bankruptcy Code.

*Id.* (Citations omitted.)

In effect, the *Wheeling* case states that while laws governing unfair labor practices, such as the National Labor Relations Act or the Illinois Human Rights Act govern the question of whether or not a claim for compensation for unfair labor practices exists and what the value of that claim is, it is the Bankruptcy Code which determines the priority and allowability of any and all claims filed in a bankruptcy proceeding. Therefore, since the issue in this case is not whether Kapernekas has a claim for back pay but rather whether that claim should have administrative priority status, it is the Bankruptcy Code which governs the issue.

Thus, it is the Bankruptcy Code which this Court must interpret and not the National Labor Relations Act or the Illinois Human Rights Act.

### A. The Plain Meaning Of The Statute

"Equality of distribution among claimants is a central policy of the Bankruptcy Code." *In re Columbia Gas System, Inc.*, 136 B.R. 930, 935 (Bankr.D.Del.1992). "Priority should not be afforded unless it is founded on a clear statutory purpose." *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984). If a claim "does not comport with the language and underlying purpose of § 503 ... [the] claim must fail." *Id.* In other words, "if one claimant is to be preferred over others, the purpose should be clear from the statute." *Nathanson v. NLRB*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952).[7]

Since "the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed." *Trustees of Amalgamated Insurance Fund v. McFarlins Inc.*, 789 F.2d 98, 100 (2d Cir.1986). "Any preference for claims not intended by Congress to have priority would dilute the value of the intended priority and thus frustrate the intent of Congress." *Jartran*, 732 F.2d at 586 (citations omitted).

The United States Supreme Court has specifically addressed the need for adhering to the "plain meaning" of the statute as the controlling principle of construction for the Bankruptcy Code.

[I]n such a substantial overhaul of the system, it is not appropriate or realistic to expect Congress to have explained with particularity each step it took. Rather, as long as the statutory scheme is coherent and consistent, there general-

---

**6.** Appellant points out and it is noted here that in the order vacating the decision in the *Wheeling* case, the affected employees were granted the same status which Mr. Kapernekas now seeks. (D.I. 7 at 19 note 11.) However, as stated *supra,* that order was the result of a settlement reached by the parties while the decision which had held to the contrary was pending appeal. Thus that order in no way represents a judicial interpretation of the *statute,* but rather it represents nothing more than the agreement of the parties involved in that litigation.

**7.** Although the *Nathanson* Court was construing the Bankruptcy Act, the principles of statutory interpretation remain constant.

ly is no need for a court to inquire beyond the plain language of the statute. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). Judge Balick, in the proceeding below, correctly relied on the plain meaning of § 503(b)(1)(A) in denying Kapernekas' claim.

■ Appellant asserts two theories for granting his claim administrative priority under § 503(b)(1)(A): (1) that his claim be treated as one for wages; and (2) that his claim be considered a necessary cost of the estate since it represents a necessary cost of doing business as defined by the Supreme Court in *Reading v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). The plain meaning of § 503(b)(1)(A) prohibits Kapernekas' and the NLRB's suggestion that Kapernekas' claim for back pay constructively earned post-petition be treated as one for wages actually earned and accorded administrative priority status. Congress specifically modified costs and expenses with the words actual and necessary. Indeed, as appellees have argued, the use of the adjective actual expressly precludes a reading which would encompass "constructive."

Furthermore, unlike with general administrative claims, Congress was quite specific about which wage claims were to receive administrative priority. Following the phrase "actual and necessary costs and expenses of preserving the estate", is an il-

lustration of the type of wage claims which might qualify as such, "including *wages,* salaries, or commissions, *for services rendered* after the commencement of the case." With this wording Congress made it clear that the only wages which were to be given priority in § 503(b)(1)(A) were those for services rendered post-petition.[8] In other words, not all wage claims are given priority because not all wage claims are necessary for the preservation of the estate, only those wage claims for services rendered post-petition are necessary for the preservation of the estate. In short, only those wage claims which are paid to induce employees to continue to work for an employer who has filed a petition for Chapter 11 are necessary for the preservation of the estate and thus are an administrative priority. The use of the participle rendered to modify services precludes Kapernekas' and the NLRB's interpretation that § 503(b)(1)(A) can be read to include wages constructively earned or back pay which has accrued during that period. Section 503(b)(1)(A) clearly requires that for wage claims to qualify for administrative priority status a service must have been rendered to the estate post-petition. Since Kapernekas did not render any service to the estate for the time in question his claim does not meet the criteria required of wages under § 503(b)(1)(A).

The Bankruptcy Code contains a variety of classes of wage claims. Section 507(a)[9]

---

8. Both Kapernekas and the NLRB contend that the plain meaning argument is erroneous because it is based on a misreading of the word "including" to mean "including only" in contravention of § 102(3) of the Bankruptcy Code. (D.I. 14 at 1; D.I. 6 at 7.) In fact, the NLRB contends that the Bankruptcy Court in denying administrative priority "mistakenly read the word "including" to mean "including only". This Court fails to see that such a misreading was implicit in the Bankruptcy Court's decision. Rather this Court understands the Bankruptcy Court to have held that Kapernekas' claim is neither an administrative priority in general nor one of the specifically enumerated administrative priorities. The Bankruptcy Court's discussion of wages (which is largely the incorporated discussion of the *Wheeling* court, is addressed not to the general contention that Kapernekas' claim constitutes an administrative expense but to the specific contention that his claim constitutes a "wage" as that word is used in

§ 503(b)(1)(A). As to the latter contention, the word "including" precedes "wages." Section 503(b)(1)(A) does *not* read "wages, including those for services rendered"; it reads "including wages ... for services rendered." In fact, as discussed *infra* the quite extensive treatment afforded by the Code to different classes of wage claims leads to the conclusion that the placement of the word "including" in § 503(b)(1)(A) is intended to mean that while wage claims may be only one example of claims afforded administrative priority status, the only wage claims which qualify are those for "services rendered."

9. Section 507(a)(3) reads in relevant part:
   (a) The following claims and expenses have priority in the following order:....
   (3) Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay—

grants a lower priority to wages earned within the 90 days preceding petition than it does to wages earned for services rendered post-petition. Thus, it is clear from the statutory scheme that Congress did not intend to give all back pay claims equal status. Furthermore, given § 507's creation of lower priority for pre-petition back pay actually earned, granting Kapernekas' constructively earned post-petition back pay claim priority status would have the effect of granting the claim of an employee who did not work, higher priority than the claim of an employee who did work. Such disparate treatment is not authorized by the plain language of the code.

Appellant and the NLRB urge that this Court must "find that the wages which accrued between December 30, 1990 and the date of Mr. Kapernekas' claim are to be treated, for all purposes, as wages for services actually rendered after the commencement of the case." (D.I. 7 at 17.) Appellant's argument is well-grounded in the labor and anti-discrimination policies discussed by appellant and the NLRB, but is not clearly found in the policies of the Bankruptcy Code which this Court has been asked to interpret.[10]

B. *Reading Co. v. Brown And The Benefit To The Estate Debate*

■ Appellant argues that the authority to grant administrative priority to Kapernekas' claim is indeed found in the language and judicial interpretation of the Bankruptcy Code. This argument finds it basis in the Supreme Court's decision in *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), and the cases which followed which hold that certain costs which do not "benefit" the estate, or help preserve the estate are nonetheless administrative costs granted priority status under § 503(b)(1)(A) if those costs are the costs of harm caused by the debtor in possession, specifically if the costs are incurred by a debtor's committing a tort post-petition or violating a statute post-petition.

Although in *Reading*, the Court was interpreting § 64(a)(1) of the Bankruptcy Act, the language in question was almost identical to that in issue here. Furthermore, since the legislative history of 11 U.S.C. § 503(b)(1)(A) indicates that it is derived from § 64(a)(1) of the Bankruptcy Act, judicial interpretations of § 64(a)(1) are relevant. *Trustees of Amalgamated Insurance Fund v. McFarlins, Inc.*, 789 F.2d 98, 101 n. 1 (2d Cir.1986). In *Reading*, petitioner sought administrative priority for a claim of damages incurred by a fire caused by the receiver's negligence. The company in question had filed a petition for arrangement under Chapter 11 of the Bankruptcy Act, and a receiver, Brown, had been appointed to run the business, which consisted principally of the leasing of one industrial structure which was the debtor's only significant asset. A fire destroyed the building and for the purposes of the litigation at issue it was assumed that the damage to petitioner's property was caused by the negligence of the receiver and the workmen he employed. Petitioner sought administrative priority, and the Supreme Court in interpreting the then

---

(A) earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first: but only

(B) to the extent of $2,000 for each such individual.

**10.** In fact, a leading treatise on the Bankruptcy Code states that "however viewed, the employment [from which the wage claim derives] must be necessary and actual to merit status as an administrative expense." 3 *King, Collier on Bankruptcy* ¶ 503.04 at 503–28 (15th Ed.1991). The text goes on to discuss the split of authority among the courts of appeals on an analogous issue to the one in this case—the treatment of severance pay claims which are based on length of employment as priority claims. The First, Third and Ninth Circuits hold that severance pay "should not be accorded priority under those sections [503(b)(1)(A) and its predecessor former Section 64a(1) ] just because the right to payment arose after initiation of the case." In determining whether or not severance pay qualified as an administrative expense, the courts instead focused on when the consideration for the severance pay was given and whether the consideration was beneficial to the debtor in possession. *Id.* at 503–29 to 503–30. The Second Circuit, on the other hand, has accorded priority to severance pay claims in full as costs of administration.

relevant section of the Bankruptcy Act granted the claim administrative priority status. Section 64(a) of the Bankruptcy Act stated:

"The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be (1) the costs and expenses of administration, including *the actual and necessary costs and expenses of preserving the estate* subsequent to filing the petition...." (Emphasis added.)

The argument advanced against petitioner was that negligence claims should be excluded from first priority since they are not "necessary to encourage third parties to deal with an insolvent business, that first priority would reduce the amount available for the general creditors, and that first priority would discourage general creditors from accepting arrangements." *Reading v. Brown,* 391 U.S. at 477, 88 S.Ct. at 1763. The Supreme Court decided in favor of petitioners on the basis of "fairness to all persons having claims against an insolvent." *Id.* The trustee urged that the "petitioner [was] in no different position from anyone else injured by a person with scant assets: its right to recover exists in theory but is not enforceable in practice," *id.* at 478, 88 S.Ct. at 1763, the Supreme Court disagreed stating that "petitioner did not merely suffer injury at the hands of an insolvent business: it had an insolvent business thrust upon it by operation of law." *Id.* The Court reasoned that the fire victims should collect "ahead of those creditors for whose benefit the continued operation of the business (which unfortunately led to a fire instead of the hoped-for rehabilitation) was allowed." *Id.* Finally, the *Reading* Court held that " 'actual and necessary costs' should include costs ordinarily incident to operation of a business and not be limited to costs without which rehabilitation would be impossible. It has long been the rule of equity receiverships that torts of the receiverships create claims against the receivership itself." *Id.* at 483, 88 S.Ct. at 1766. Thus, in *Reading,* the cost of committing a tort post-petition is a cost of doing business.

In *In re Charlesbank Laundry, Inc.,* 755 F.2d 200 (1st Cir.1985), the First Circuit addressed the issue of whether "a civil compensatory fine for violation of an injunction by a debtor corporation engaged in a Chapter 11 reorganization qualifies for first priority as an administrative expense under 11 U.S.C. § 503(b)(1)(A) as 'actual, necessary costs and expenses of preserving the estate.' " *Id.* at 201. In *Charlesbank Laundry,* an injunction was imposed upon a laundry operation against which a nuisance action had been brought. The laundry continued to operate in violation of the injunction. While the nuisance action was still pending and the injunction still in effect, Charlesbank filed a Chapter 11 petition. The First Circuit held that the case fell within the "clearly enunciated rationale of *Reading v. Brown* " because "[t]he same fairness principle favor[ed] plaintiffs ... whose premises, lives, or businesses were adversely affected by Charlesbank's continuing conduct in violation of the injunction." *Id.* at 202.

The analysis of *Reading* and its progeny is inapplicable to the case at hand. The *Reading* analysis requires a post-petition action causing harm such as a violation of a statute or a tort. While appellant and the NLRB attempt to characterize Continental's failure to reinstate Kapernekas before exhausting their right to appeal, as a post-petition violation of the Illinois Human Rights Act, this Court does not accept such a characterization. As Judge Balick stated: "Gus Kapernekas was wrongfully terminated pre-petition." (Tr. at 36.) It was that pre-petition wrongful termination by Continental which constituted the act that violated the Illinois Human Rights Law. Continental's failure to reinstate Kapernekas, which appellant and the NLRB urge this Court to treat as a separate violation of the Illinois Human Rights Act, was in fact nothing more than Continental's legitimate use of the "natural appellate process" (Tr. at 36) in effect in Illinois. Thus any wrong-doing must be considered pre-petition wrong-doing and does not bring Kapernekas' claim under the umbrella of *Reading.*

In fact, the seemingly conflicting cases cited by both appellant and appellee, which address the issue of the administrative priority status for back pay claims arising from unfair labor practices, can, with one exception, be reconciled by making the time of the unfair labor practice, rather than the time the claim accrued, the decisive factor in determining whether the backpay claim is a pre-petition or post-petition claim and thus whether it is entitled to administrative priority. The parties cite *In re Wheeling–Pittsburgh Steel Corporation*, 113 B.R. 187 (Bankr.W.D.Pa.1990), vacated as moot and without precedential value, 147 B.R. 874 (1992); *In re Bel Air Chateau Hospital, Inc.*, 106 LRRM 2834, 1980 WL 18749 (1980); *NLRB v. Walsh*, 139 B.R. 942 (9th Cir.BAP 1992); and *In re Brinke Transportation*, 135 LRRM 2769, 1989 WL 233147 (1989). *Walsh* and *Wheeling* denied administrative priority status to the back pay claims on the grounds that there was no benefit to the estate.[11] In addition, both *Walsh* and *Wheeling* involved pre-petition violations of the relevant statutes, and thus *Reading* was inapplicable. While *Bel Air* and *Brinke* granted administrative priority to the claims under a *Reading* analysis, in *Bel Air*, the violation of the National Labor Relations Act occurred post-petition and thus, *Reading* was in fact, applicable. It is only the *Brinke* case which stands at odds with both this Court's holding, and the previous case law on the subject.[12] The irreconcilable difference is caused by the *Brinke* court's use of the time the claim accrued rather than the time the statute, which gave rise to the claim, was violated as a method for determining whether a claim is pre-petition or post-petition. The reasoning in *Reading* does not support such a conclusion.

A closer look at the rationale of both *Reading* and *Charlesbank* will confirm the

**11.** In *Walsh* which had facts quite similar to the case at hand, the Ninth Circuit Bankruptcy Appellate Panel rejected the same arguments that the NLRB and appellant advance here. First the *Walsh* court held that the plain meaning of § 503(b)(1)(A) prevented treatment of the back pay claim:

> It is clear from the plain language of Section 503(b)(1)(A) that administrative priority is given only to those expenses which represent "services *rendered* after the commencement of the case." [Emphasis in original; citation omitted.] The term "render" means to perform, to give or to furnish. [Citation omitted.] Because Cook did not perform, give or furnish any actual services to the Debtor, the ... claim for back pay during the postpetition period does not represent actual or necessary costs of preserving the estate.

*Walsh*, 139 B.R. at 944. The court also rejected the same *Reading* and *Charlesbank* argument offered in this case, but on somewhat different grounds.

> The Board [NLRB] contends, however, that the Debtor's failure to reinstate Cook was a violation of the order of the administrative law judge. Thus, the Board argues, the costs incurred as a result of such postpetition conduct should be treated as administrative expenses.... [A brief discussion of *Reading* and *Charlesbank* followed.] *Reading* and *Charlesbank Laundry* are not dispositive here. Section 503(b)(1)(A) clearly establishes the treatment of *wages, salaries, or commissions* as administrative expenses. Because accrued back pay is treated like regular wages under the Code, such wages are subject to the re-

> quirements of Section 503(b)(1)(A) and must represent services *rendered* in order to be granted administrative priority.

*Id.* (Emphasis in original.)

**12.** The *Brinke* case in some ways is internally inconsistent. On the one hand, it states that

> [t]he implicit limit on the rule that post-petition costs of compliance with the N.L.R.A. constitutes an administrative expense is that the employer must have incurred those costs *after it filed for bankruptcy*. More specifically, the consideration for the employer's debt must have been received by the employer during the post-petition period.

*Brinke*, 135 LRRM at 2772. Yet, on the other hand, it holds that a prepetition violation of the NLRA can give rise to an administrative priority claim for back wages. Where this Court (and in fact the *Wheeling* Court) finds the *Brinke* decision flawed is in its conclusion that a pre-petition violation of statute somehow results in post-petition consideration to the estate. In fact, the *Walsh* court also must have found this aspect of the *Brinke* decision problematic since *Walsh* cites *Brinke* for the proposition that "in order for postpetition costs of compliance with the NLRA to constitute administrative expenses the consideration for those costs must have been received during the postpetition period," *Walsh*, 139 B.R. at 944, thus holding that a prepetition violation of the NLRA does not give rise to an administrative priority claim, even for the wages which accrued postpetition—the exact opposite holding from that delivered by the *Brinke* court.

conclusion that Continental's wrongdoing was an entirely pre-petition act. In explaining its holding in *Reading* the Supreme Court stated "petitioner did not merely suffer injury at the hands of an insolvent business: it had an insolvent business thrust upon it by operation of law." *Reading* 391 U.S. at 478, 88 S.Ct. at 1763. In other words, the petitioner in *Reading* was harmed only because the bankrupt business was allowed to continue. Had the bankrupt business been forced to close down, no injury to petitioner would have occurred. The Supreme Court reasoned further that victims should collect "ahead of those creditors for whose benefit the continued operation of the business (which unfortunately led to a fire instead of the hoped-for rehabilitation) was allowed." *Id.* In other words, the Bankruptcy Code interfered with the normal course of events in which the business would have failed. The Bankruptcy Code authorizes such interference in order to afford creditors a better opportunity to recoup their losses, under the theory that a business is worth more as a going concern than it would be if liquidated. However, should the business cause harm during this period in which it is operating under the protection of the code for the benefit of the creditors, fairness dictates that the claims of those to whom it caused harm must have priority over those for whose benefit it was operating.

In short, both the claimants in *Reading* and *Charlesbank* would have suffered less harm had the companies involved failed rather than been given a chance to reorganize. It is for this reason that their claims have priority as administrative expenses. Kapernekas, however, is more like the creditor for whose benefit the company is allowed to continue. Kapernekas has benefitted by the fact that Continental is still operating on a daily basis. Because Continental is still operating, Kapernekas is presently employed. He also still has a general unsecured claim for past wages, on which Bankruptcy theory dictates he is likely to recover more with Continental still

operating than he would have if they had been forced to liquidate. It is thus clear that Kapernekas' claim derives from a pre-petition wrong. Unlike the claims in *Reading* and *Charlesbank* no new harm was done to Kapernekas from a post-petition act by Continental, rather the damage caused by the pre-petition harm continued to accrue. This Court rejects appellant's contention that "[e]very day Continental failed to meet those obligations, [the obligations of state and federal discrimination laws] constituted another violation," (D.I. 14 at 6), because it mischaracterizes the violation. The violation in the Continental case was not the failure to reinstate, but rather the wrongful termination, which could by definition occur only once, and that occurrence was a pre-petition event. Unlike the injunction in *Charlesbank* which was violated on a daily basis causing additional harm to neighbors, the Order of the Illinois Human Rights Commission was not violated, it was appealed. This Court refuses to characterize Continental's use of the natural appellate process available in Illinois, as a series of continual violations of Illinois law. Once it is clear that the single violation involved in Kapernekas' claim was his wrongful termination, it is clear that the only violation was a pre-petition event, and therefore there is no question that *Reading* and its progeny are inapplicable.

Finally, the NLRB contends that today's decision would mean that "if the Debtor had unlawfully discharged Kapernekas *after* the bankruptcy petition was filed, the backpay would not be entitled to administrative priority because Kapernekas would not have rendered actual services during the post-petition back pay period." (D.I. 13 at 2.) While today's holding might preclude such a claim from being granted administrative priority as "wages ... for services rendered," it would not preclude such a claim from being granted priority as "an actual and necessary expense of preserving the estate" under a *Reading* analysis.[13] This Court holds that Kapernekas' claim constitutes neither "wages ... for services

---

**13.** In fact, it appears that the NLRB itself has misconstrued the term "including." "[W]ages ... for services rendered" follows "including" and is thus an example of one type of administrative priority. *Reading* and its progeny offer another example of a type of administrative

rendered after the commencement of the case," nor an administrative expense which is the necessary cost of a post-petition violation of statute in accordance with a *Reading* analysis. It is the plain meaning of the statute which prevents Kapernekas' claim from being granted administrative priority as "wages ... for services rendered after the commencement of the case," and it is the fact that Continental's statutory violation was a pre-petition occurrence which prohibits Kapernekas's claim from being granted administrative priority as a *Reading* post-petition cost of doing business.

This Court notes that Kapernekas and the NLRB have made compelling arguments that the interpretation of 11 U.S.C. § 503(b)(1)(A) accepted by the Bankruptcy Court and affirmed here may threaten the effectiveness of the broad remedial powers granted to the National Labor Relations Board by the National Labor Relations Act. The cogent arguments proffered by both appellants and appellees show that this particular question represents a clash of the public policies underlying two statutes. The parties' dispute has convinced this Court that a conflict exists between the policy of Acts directed at the prevention of unfair labor practices (such as the National Labor Relation Act and in this case the Illinois Human Rights Act) to attempt to make a discriminated-against employee whole for losses suffered through unfair labor practices and the policy of Chapter 11 to rehabilitate the debtor. Such a conflict, however, must be resolved by the legislature, not the judiciary. Since the statute which this Court is required to interpret is the Bankruptcy Code, it is the relevant policies of that code which must be considered by this Court. The interplay between the conflicting statutes and the negative ramifications resulting from that interplay are matters for Congress. Weighing the relative values of conflicting public policies requires considering effects on various groups, and in all probability requires research into those effects. It is within Congress' general investigatory powers to commission the necessary reports and studies and then make an informed decision. It is within this Court's power to interpret only the statute at issue, which is § 503(b)(1)(A) of the Bankruptcy Code.

The plain meaning of that statute combined with the purpose for which that statute was created mandate that Kapernekas' post-petition wage claim not be granted priority status. It is not that this Court disagrees with appellant's contention that in order for the policies promulgated by such laws as the National Labor Relations Act and the Illinois Human Rights Act to be fully effectuated, wages which accrued post-petition should be treated, "for all purposes, as wages for services actually rendered." It is, however, this Court's holding that the Bankruptcy Code itself does not authorize administrative priority status for back wage claims of the type Kapernekas seeks; that it is the Bankruptcy Code which this Court has been asked to interpret and that it is up to Congress to amend the Bankruptcy Code to accommodate the policies of the National Labor Relations Act or any other similar law, if the Code is to accommodate those policies at all. Thus the Bankruptcy Court's June 8, 1992 Order will be affirmed.

priority, which is a cost associated with a post-

petition tort or violation of statute.